## THE STATE vs. BUZZARD.

That clause of the Revised Statutes which makes wearing concealed weapons a penal offence, is not contrary either to the constitution of the United States, or of this State.

THIS was an indictment under the statute against carrying concealed weapons, tried in the Chicot Circuit Court, in November, A. D. 1839, before the Hon. EUCLID L. JOHNSON, one of the Circuit Judges. The indictment was quashed on the motion of Buzzard, on the ground that the law was unconstitutional; and the State appealed.

Clendenin, Atto. Gen., for the State.

Pike, contra:

After advisement, the following opinions were delivered:

By RINGO, C. J.

This is a prosecution based upon the 13th section of the first Article, Division VIII., Ch. 44, Rev. St. Ark., p. 280, which declares, that " every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor." The indictment was quashed, and the defendant ordered to be discharged by the Circuit Court; and the State has, by appeal, brought the case before this Court, to revise said decision.

No question as to the sufficiency of the indictment, in point of form, has been raised or argued at the bar, and in this respect it is believed to be substantially good. But the appellee insists that the provisions of the statute above quoted, upon which the prosecution is founded,

The State *vs.* Buzzard.

are in conflict with and repugnant to the second article of the amendments of the constitution of the United States, which ordains that " a well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed." The attorney for the State contends that the enactment in question is not prohibited by any fundamental law of the land, and that the Legislature of this State possesses legitimately the power of regulating by law the use of such weapons as are mentioned therein, as that body has assumed to do by said enactment.

In order to arrive at a just conclusion in regard to the question under consideration, it may in the first instance be necessary to recur to some of the primary objects for which the government was instituted, and concisely state what are understood to be its principal obligations, not only in reference to the aggregate community, but also to each individual member of which it is composed; and then consider the extent of its powers, and how far they are limited by this article in the federal constitution.

Among the objects for which all free governments are instituted, may be enumerated the increase of security afforded to the individual members thereof for the enjoyment of their private rights, the preservation of peace and domestic tranquillity, the administration of justice by public authority, and the advancement of the general interests or welfare of the whole community. In addition to which, it is designed that adequate security shall be provided by law for the most perfect enjoyment of these blessings. Consequently, where the people, in forming the government, have not by some fundamental law made such provision as, in every variety of circumstances which may exist, shall be found necessary to the attainment of every object for which it was established, nor expressly, or by necessary or reasonable implication, prohibited the Legislature from supplying by law such omission, the obligation to do so is conceived to be unquestionable; otherwise, the people could not, through the instrumentality and agency of the government, possess and enjoy, in the greatest degree of which they are capable, all of the blessings and advantages which, by its institution, they intended to insure to themselves and posterity.

It results, therefore, that the legislative department, if not so inhi-

bited, possesses adequate powers to provide, by laws adapted to the purpose, the means by which those who compose the community shall aggregately and individually be secured in the full and complete enjoyment of all such benefits as may be derived from the operation or influence of the government. And in the execution of this power, and the performance of the high and important obligations devolved upon it, the Legislature possesses, and must necessarily exercise a discretion as to the means best calculated *to attain* the object, which in the nature of things is, and must remain, without control, provided no right vested by the constitution, or other authority paramount to that of the Legislature, be by their enactment infringed or divested. Now, if I have not wholly mistaken the objects for which the government was instituted, the trusts confided to it, and the powers with which it is invested, those who subjected themselves to its operation, must, in consideration of the advantages which they trusted and believed would result from it to themselves and posterity, have voluntarily surrendered or subjected to the control of the public authorities provided for the administration of the government many if not all of the rights of which, independent of all government, they would have been possessed without any restriction whatever. For instance, the right of any individual to redress, according to the dictates of his own will or caprice, any injury inflicted upon his personal or private rights by another, is surrendered; and the right of determining not only what his rights are, but also whether they have been invaded, and the kind and measure of redress to which he is entitled, are all referred to the arbitrament of the law. Also the natural right of speech must remain without restraint, if it were not surrendered and subjected to legal control upon the institution of government; yet every one is aware that such limitations as have been found necessary to protect the character and secure the rights of others, as well as to preserve good order and the public peace, have been imposed upon it by law, without any question as to the power of the government to enforce such restrictions. So the liberty of the press, which is based upon the right of speech, is to the like extent subject to legal control. So the right of migration and transmigration, or of every individual to pass from place to place, according to his own free will and pleasure,

when and where he chose, acknowledged no restraint until surrendered upon the institution of government, when it became subject to such regulations as might be found necessary to prevent its exercise from operating prejudicially upon the private rights of others, or to the general interests of the community. These rights are believed to be as essential to the enjoyment of well regulated liberty, and as fully guarded against infringement by the government, as the right to keep and bear arms. Their use, if subject to no legal regulation or limitation whatever, would tend to unhinge society, and most probably soon cause it either to fall back to its natural state, or seek refuge and security from the disorders and suffering incident to such licensed invasion of the rights of others, in some arbitrary or despotic form of government; while their unrestrained exercise, so far from promoting, would surely defeat every object for which the government was formed. And if the right to keep and bear arms be subject to no legal control or regulation whatever, it might, and in time to come doubtless will, be so exercised as to produce in the community disorder and anarchy.

Suppose the constitutional existence of such immunity in favor of the right to keep and bear arms as is urged by the appellee be admitted. By what legal right can a person accused of crime be disarmed? Does the simple accusation, while the law regards the accused as innocent, operate as a forfeiture of the right? If so, what law attaches to it this consequence? Persons accused of crime, upon their arrest, have constantly been divested of their arms, without the legality of the act having ever been questioned. Yet, upon the hypothesis assumed in the argument for the appellee, the act of disarming them must have been illegal, and those concerned in it trespassers, the constitution not limiting the right to such only as are free from such accusation. Nor could the argument of necessity or expediency justify one person in depriving another of the full enjoyment of a right reserved and secured to him by the constitution. Again, the term " arms," in its most comprehensive signification, probably includes every description of weapon or thing which may be used offensively or defensively, and in the most restricted sense, includes guns or firearms of every description, as well as powder, lead, and flints, and such other things as are necessarily used in loading and discharging them,

so as to render them effective as instruments of offence or defence, and without which their efficiency for these purposes would be greatly diminished, if not destroyed. By what authority, then, (if powder is comprehended by the term " arms,") can a person be prohibited from keeping, at such place and in such situation as he may desire, upon his own premises, any amount of powder he may think proper, however much it may endanger the lives or property of others? Certainly none. And yet, the right of inhibiting by law the keeping of powder in places where its explosion would endanger the lives or property of others, has been constantly asserted and enforced, without question as to the legal right or power of imposing such restriction. Still no such prohibition can be legally made or enforced, if the principles asserted in the argument for the appellee be true. Other instances, in which the right to keep and bear arms has been either directly or indirectly subjected to legal regulations and restrictions, without any question as to the power so exercised, could be referred to; but that just mentioned is esteemed sufficient to prove, that in the judgment of the people of the United States, the right in question possesses no such immunity as exempts it from all legal regulation and control.

And here it may not be without utility to inquire for what object the right to keep and bear arms is retained exempt from all legal regulation or control, if in fact it has been so retained, as urged in the argument for the appellee. Is it to enable each member of the community to protect and defend by individual force his private rights against every illegal invasion, or to obtain redress in like manner for injuries thereto committed by persons acting contrary to law? Certainly not; because, according to the fundamental principles of government, such rights are created, limited, and defined by law, or retained subject to be regulated and controlled thereby; and the laws alone are and must be regarded as securing to every individual the quiet enjoyment of every right with which he is invested; thus affording to all persons, through the agency of the public authorities to whom their administration and execution are confided, ample redress for every violation thereof. And to these authorities every person is, in most cases, bound to resort, for the security of his private rights, as well as the redress of all injuries thereto. Hence it has become a maxim in

The State *vs.* Buzzard.

all well organized governments, that there is no wrong without a remedy, or, in other language, that the law furnishes to each individual some adequate remedy for every invasion of, or injury to, his private rights. Such legal remedies, however, can only be enforced by public authority; yet, from the very institution of the government, every individual is considered as freely assenting to assist in maintaining the laws and executing their mandates. Consequently, the public authorities have a right to demand their aid in enforcing legal remedies, whether they so operate as to prevent or redress injuries, apprehended or suffered. And this obligation of the government to protect every individual in the quiet and peaceable enjoyment of his private rights, and afford him redress for all injuries thereto, including also the power of coercing by public authority the performance of all legal obligations, constitutes not only the most perfect and ample security to individuals for the enjoyment of their private rights, but is believed to have formed one of the great objects for which the government was instituted. Now, is it reasonable to suppose that either those who proposed or those who adopted the article under consideration, doubted the capacity or disposition of the government to discharge every obligation devolved upon it? Surely not. And therefore it is conceived that the right in question could not have been so retained and secured with any view to the protection or vindication of such rights of individuals as are merely private.

Another great object contemplated by the people in the institution of the government, was to establish a more perfect union, by creating a community of interests and a common concert of action in the different members of the State, by which their common interests could be better promoted and defended. And, therefore, the obligation of making, from time to time, such legal provision as shall be found necessary to advance their common or public interests, or to protect, preserve, and defend the free institutions they had established, was imposed upon the legislative department of the government. And in order to perform this important trust, there was necessarily confided to it a discretion as to the means best adapted to the object, over which the judiciary has no control, unless the enactment be repugnant to some law of paramount obligation.

But surely if the government does not possess the power of so regulating and controlling, by law, the acts of individuals, as to protect the private rights of others, preserve domestic tranquillity, peace and order, promote the common interests of the community, provide for the common defence of the country, and the preservation of her free institutions, established for the common benefit of the people, and, in a great measure, committed to its fostering care, its powers are inadequate to the performance of the obligations imposed upon it. Such, however, is not believed to be the case, as the government possesses, in my opinion, ample power to inhibit, by law, all such acts and practices of individuals, as affect, injuriously, the private rights of others, tend to disturb domestic tranquillity, or the peace and good order of society, militate against the common interests, impair the means of common defence, or sap the free institutions of the country; and to enforce the observance of such laws by adequate penalties, the character and quantum of which, in most respects, depend exclusively upon the will and judgment of the legislature.

If these general powers of the government are restricted in regard to the right to keep and bear arms, the limitation, to whatever extent it may exist, will be better understood, and more clearly seen, when the object for which the right is supposed to have been retained, is stated. That object could not have been to protect or redress by individual force, such rights as are merely private and individual, as has been already, it is believed, sufficiently shown: consequently, the object must have been to provide an additional security for the public liberty and the free institutions of the State, as no other important object is perceived, which the reservation of such right could have been designed to effect. Besides which, the language used appears to indicate, distinctly, that this, and this alone, was the object for which the article under consideration was adopted. And it is equally apparent, that a well regulated militia was considered by the people as the best security a free state could have, or at least, the best within their power to provide. But it was also well understood, that the militia, without arms, however well disposed, might be unable to resist, successfully, the efforts of those who should conspire to overthrow the established institutions of the country, or subjugate their common

liberties; and therefore, to guard most effectually against such consequences, and enable the militia to discharge this most important trust, so reposed in them, and for this purpose only, it is conceived the right to keep and bear arms was retained, and the power which, without such reservation, would have been vested in the government, to prohibit, by law, their keeping and bearing arms for any purpose whatever, was so far limited or withdrawn: which conclusion derives additional support from the well known fact, that the practice of maintaining a large standing army in times of peace, had been denounced and repudiated by the people of the United States, as an institution dangerous to civil liberty and a free State, which produced, at once, the necessity of providing some adequate means for the security and defence of the State, more congenial to civil liberty and republican government. And it is confidently believed that the people designed and expected to accomplish this object, by the adoption of the article under consideration, which would forever invest them with a legal right to keep and bear arms for that purpose; but it surely was not designed to operate as an immunity to those, who should so keep or bear their arms as to injure or endanger the private rights of others, or in any manner prejudice the common interests of society.

The court of appeals of the State of Kentucky, in the case of *Bliss vs. the Commonwealth*, 2 *Littell*, 90, and the argument of this case for the appellee, if I have not misapprehended their premises and reasoning, both assume that the right to keep and bear arms was adopted as well for the purpose of enabling individuals to defend and redress, by their own arms, injuries threatened or suffered in respect to their personal or private rights, as for the security of the State, and is not subject to any legal regulation, restriction, or control whatever; and that, by virtue of it, every person in the community possesses a privilege or immunity, by virtue of which he may keep and bear arms of every description, at all times, in every place, and in any manner, according to his own free will or caprice.

However captivating such arguments may appear upon a merely casual or superficial view of the subject, they are believed to be specious; and to rest upon premises at variance with all the fundamental principles upon which the government is based; and that, upon a more

mature and careful investigation, as to the object for which the right was retained, their fallacy becomes evident. The dangers to be apprehended from the existence and exercise of such right, not only to social order, domestic tranquillity, and the upright and independent administration of the government, but also to the established institution of the country, appears so obvious as to induce the belief that they are present to every intelligent mind, and to render their statement here unnecessary.

I cannot, therefore, indulge the opinion, that they were not distinctly foreseen by those who recommended, as well as those who adopted the article under consideration, or that they intended to incorporate into the charter of their civil policy, a principle pregnant with such dangers. Besides, it cannot have escaped the observation of any person of intelligence, whose mind has been directed to the subject, that to resist, or oppose by force, the constituted public authorities of the State acting in pursuance of law, in the discharge of any public duty enjoined upon them, must, according to the extent and success of such resistance or opposition, either produce some revolution in the government itself, or subject those who so act to such consequences as are denounced against them by law. Suppose a portion of the community consider their private rights invaded by some act or exercise of authority, on the part of the government, which they consider as unauthorized, can they, by virtue of any legal right with which they are invested, either prevent or redress such injury by private force? In my opinion they cannot; their private rights being in this, as in most other cases, committed, as it were, to the care and custody of the law; and to it, so long as our civil liberties and republican institutions remain unimpaired, they are bound to look for protection as well as redress; both of which the government is under a positive obligation to provide.

I also deem it proper to remark here, that, in my opinion, the provisions contained in the article under consideration, were designed to furnish the people of the United States precisely such security for the preservation and perpetuation of their civil liberty and republican institutions, as it was the object of those who framed the constitution of this State to provide for those subject to its jurisdiction, by the 21st

*sec.* of the 2d *art.* of the Constitution, which declares, "that the free white men of this State shall have a right to keep and bear arms for their common defence;" thus indicating, in terms too plain to be misunderstood, that the sole object of the latter in securing this right, was to provide, beyond the power of legal control, adequate means for the preservation and defence of the State, and her republican institutions. And therefore, without applying to this provision in our Constitution the maxim "*expressio unius, exclusio alterius,*" so often applied in the interpretation of laws, I have come to the conclusion, that the legislature possesses competent powers to prescribe, by law, that any and all arms, kept or borne by individuals, shall be so kept and borne as not to injure or endanger the private rights of others, disturb the peace or domestic tranquillity, or in any manner endanger the free institutions of this State or the United States; and that no enactment on this subject, which neither directly nor indirectly so operates as to impair or render inefficient the means provided by the constitution for the defence of the State, can be adjudged invalid, on the ground that it is repugnant to the constitution. The act in question does not, in my judgment, detract any thing from the power of the people to defend their free state and the established institutions of the country. It inhibits only the wearing of certain arms concealed. This is simply a regulation as to the manner of bearing such arms as are specified. The practice of so bearing them, the legislative department of the government has determined to be wrong, or at least inconsistent with sound policy. So far, that department had a discretion in regard to the subject, over which the judiciary, as I conceive, has no control; and therefore the duty of the courts must be the same, whether the policy of the law be good or bad. In either event it is binding; and the obligation of the courts to enforce its provisions, when legally called upon to do so, is imperative.

In several States of this Union, the Court of the highest authority in the State has adjudicated upon the right to keep and bear arms, under and by virtue of the provisions contained in the respective constitutions of such States, in some of which, the language used appears to be different from and more comprehensive than that used either in the constitution of the United States or of this State. But I am not

The State *vs.* Buzzard.

aware that this right has ever become the subject of any adjudication in the Federal courts, or that any of the State courts, in adjudicating upon it, have given any exposition of the article under consideration, or attempted to define the right as secured by it. It may therefore be considered as an open question; and being one of interest and importance, and as I conceive clearly within the cognizance of the Supreme Court of the United States, an adjudication of that Court upon it, by which the extent of the right may be distinctly ascertained and definitively settled, can be readily obtained, and the rule of decision in relation to it be made uniform throughout the Union.

I deem it only necessary to remark further, that the constitution of Alabama declares, that " every citizen has the right to bear arms in defence of himself and the State." Yet the Supreme Court of that State, in the case of *The State vs. Reid, Ala. Rep.* 1 *vol. new series,* *p.* 612, has decided in favor of the validity of a law of that State, which inhibits the right of carrying about the person certain weapons concealed. The constitution of the State of Indiana also provides, "that the people have a right to bear arms for the defence of themselves and the State;" notwithstanding which, the Supreme Court of that State, in the case of *The State vs. Mitchell,* 3 *Blackf. Rep.* 229, has sustained a law of that State, in no respect essentially different from the enactment now in question. In Kentucky, and I believe in Tennessee also, the question has been decided against the validity of such enactments. A conflict between the decisions of the State courts in regard to the question, certainly exists; but so far as I am informed, the preponderance on either side is not very great.

I am therefore, after a careful and deliberate consideration of the question, of the opinion that the enactment of the Legislature, above quoted, is in no wise repugnant either to the constitution of the United States or the constitution of this State, but is in every respect binding as a law of the land. Consequently, the Circuit Court erred in quashing the indictment, and thereupon discharging the defendant from the prosecution. And that judgment ought to be reversed.

The State *vs.* Buzzard.

*By* DICKINSON, J.

The appellee contends that the law, under which he stands indict-
ed, is unconstitutional, and that a right, secured to him by the 2d
article of the amendments to the Constitution of the United States,
has been violated. This article declares, that " A well regulated
militia being necessary to the security of a free State, the right of the
people to keep and bear arms shall not be infringed." The question
is one of some importance, not so much, as I conceive, from any diffi-
culty in arriving at a correct conclusion, as from the contrariety of
opinions entertained by the different State Courts that have passed
upon it. It is conceded by all, that the Federal Government is one
of limited powers. It is not contended that the General Assembly
of this State could interfere with any regulations made by Congress,
as to the organizing, arming, or disciplining the militia, or in the man-
ner in which that militia are either to keep or bear their arms. I
shall endeavor to prove that it does not do so. The class of cases to
which the constitutional provision applies, is widely different from the
right of a private citizen to bear, concealed about his person, deadly
weapons or arms. In the one, they are kept and carried in conformity
with the constitution and laws of the United States, with a certain
specific object in view: in the other, they are kept and carried for
private purposes, wholly independent of any constitutional regulation,
and to answer private ends, which have no bearing upon the security
of the State. If this idea be correct, then it follows, that when arms
are not kept or used for the defence of the State or Federal Govern-
ment, the manner of carrying and mode of using them are subject to
the control and authority of the State Legislature. Every citizen
owes a double allegiance, and is entitled to the two-fold protection of
the General and State Governments. To the first, the Constitution
of the United States commits the powers of war, peace, commerce,
negotiation, and those general powers relating to our external rela-
tions, and also the powers of an internal kind which require uniformity
in their operation. To the second, belong all that is not included in
the first, of a municipal character, particularly every thing connected
with the police and economy of the State. If the provision, when it

speaks of militia connected with the people, knew no exception as to the time, mode, and manner in which the right to keep and bear arms should be exercised, the present question could not have arisen. And as the whole difficulty in this case has arisen out of this blending together the terms " well regulated militia" and " the right of the people to keep and bear arms," so that difficulty will be removed by a close attention to the difference in the nature and character of the constitutional prohibition and the legislative provision, and the result of their operations respectively. Whenever a question arises as to any constitutional provision, it is proper, in order to ascertain its object, to look into the manner in which it has been carried out by Congress, and to the purposes which it was intended to answer. That a " well regulated militia is necessary to the security of a free State," will not be questioned. The manner of regulating, was to organize, arm, and discipline them; to do this, full power is vested in Congress by the declaration or bill of rights, and numerous laws have from time to time been passed by that body, for that purpose; thereby giving a construction to the article in question. The militia being necessarily composed of the people, as our government is opposed in principle to standing armies, the provision that they should have a right to keep their arms and use them, was a wise one, and necessary to carry out the object of the grant, in providing at all times for the security of the States. It is admitted that the laws for organizing, arming, and disciplining the militia, were passed in virtue of the power given by the Constitution of the United States to regulate them. If we look into the history of the country, we shall alike arrive at the conclusion that the power given the militia to keep and bear arms, resulted from the necessity of having a military force at all times at the command of the Federal and State governments, armed and ready to repel force by force, sustain the laws, and enforce obedience to the mandates of their courts.

The motive, then, for granting this power to keep and bear arms, could not be extended to an unlimited, uncontrolled right to bear any kind of arms or weapons, upon any and every occasion; still less the terms, for they are restrictive in their language. That a well regulated militia is necessary for the security of a free State, and that the right

The State *vs.* Buzzard.

of the people to keep and bear arms ought not to be infringed, are principles not in the slightest degree encroached upon by the legislative enactment of this State prohibiting the wearing of concealed weapons.

One of the objects of the constitution was, " to provide for the common defence." To legislate upon this subject, is clearly within the constitutional charter; and that the States retain the power to legislate in relation to arms, and the mode of carrying and keeping them, provided its exercise is not repugnant to the previous grant to the Federal Government, is incontrovertible. The State Governments are charged with the police of the State. They, considering acts as having a demoralizing tendency, can prohibit them. Could Congress authorize any and every person, by express law, to carry deadly weapons concealed about his person, when not composing one of the militia, and not a part of the regulations ordained for their government? The police of a State is to be regulated by its own laws; and the Federal Government cannot interfere with it, so as to legalize any act which the State prohibits, and which is not necessary to carry out any of the great objects for which it was instituted. So long as the enactments of the General Assembly do not weaken the arm of the Federal Government, impair its power, or lessen its means to protect and sustain itself, and preserve inviolate the freedom of the States, they must be respected and enforced. But the slightest interference with the constitutional regulations and restrictions, in effecting these objects, becomes a violation of the compact between the State and Federal authorities, and ceases to be obligatory upon the citizen. The protection which a government owes to the States is political in its character: the municipal regulations to extend that protection to the citizen in his individual capacity, must be left to the State authority, and are such only as are consistent with the safety of others. Indeed, it is scarcely possible to look into the statute book, and not find written upon almost every page some restraints upon what are considered natural rights. The argument of the appellee, that men swayed by their interests, or governed by their passions, shall be permitted to wear a dirk, butcher-knife, &c., concealed as a weapon, independent of the control or authority of law, and that the General Assembly

cannot, by legal enactment, when the use is at the time not required or necessary for military purposes, prohibit it, is to my mind as mischievous as it is erroneous. To assert that a citizen is entitled to protection from his government, and then deny to that government the means of securing it, is a contradiction in terms, difficult if not impossible to be reconciled.

The provision of the Federal constitution, under which the appellee claims his discharge, is but an assertion of that general right of sovereignty belonging to independent nations, to regulate their military force. Nor has the General Assembly attempted to interfere with the exercise of that right. The enactment in question is a mere police regulation of the State for the better security and safety of its citizens, having reference to weapons and arms of a wholly different character from such as are ordinarily used for warlike purposes. The principle contained in the provision of our constitution, which declares that "the freemen of this State shall keep and bear arms for their common defence," is precisely similar to that of the United States; it stands upon the same ground, and is declaratory of the same right. The terms "common defence," in ordinary language, mean national defence. The reason for keeping and bearing arms, given in the instrument itself, is clearly explanatory, and furnishes the true interpretation of the claim in question. The militia constitutes the shield and defence for the security of a free State; and to maintain that freedom unimpaired, arms and the right to use them for that purpose are solemnly guarantied. The personal rights of the citizen are secured to him through the instrumentality and agency of the constitution and laws of the country; and to them he must appeal for the protection of his private rights and the redress of his private injuries. To deprive the General Assembly of the power to regulate and control those rights, when not inconsistent with the grant to the General Government, would be to take away from the State the terrors of the law and the restraint of its moral influence, upon which its prosperity mainly depends. It is true, the terms of the grant are affirmative; but affirmative words are often, in their operation, negative of other objects than those affirmed; and in the construction of an article of the constitution, the whole must be taken in view, and that construction adopted,

The State *vs.* Buzzard.

which will consist with its words, and best promote its general intention. And we are authorized to imply a negative from affirmative words, where that implication promotes the intention. So a limitation on the broad terms of the grant is necessarily implied in other branches of this power, and in the manner in which it has been exercised by Congress.

The grand object of the framers of the Constitution of the United States, was to establish a common government for sovereign States, and to leave that sovereignty unimpaired, wherever it could be so left without impairing the government of the Union. That Congress has never, in any one single instance, even by implication, passed any law relating to the militia, their organization, discipline, or arms, except as in reference to some known or supposed public enemy, *in præsenti* or *in futuro*, where the services of the militia might be requisite for the common defence, and for the security of the States, is to my mind a strong argument that they do not deem themselves authorized to interfere with the police regulations of a State, as to the mode or manner in which arms may be carried in time of peace, and in the ordinary associations of life unconnected with military warfare.

The act of the General Assembly of this State, rendering it penal to carry concealed weapons, does not, in my opinion, conflict with any of the powers of the General Government. On the contrary, I view it as the exercise of a power loudly called for by our citizens, and which, if strictly enforced by the public authorities, would add greatly to the peace and good order of society, the security of our citizens at home, and the reputation of the State abroad.

I therefore concur with the Chief Justice, that the exercise of the legislative power in the enactment of the law in question, does not infringe either the Constitution of the United States or of this State.

*By* Lacy, J.

The defendant in the court below stands indicted by virtue of the authority of the 13th section of an act of the Legislature, prohibiting any person wearing a pistol, dirk, large knife, or sword-cane, *concealed as a weapon*, unless upon a journey, under the penalties of fine and imprisonment. *Rev. Stat., p.* 280.

5

The question now to be determined is, does this provision of the statute violate the second article of the amendments to the Constitution of the United States, or the 21st section of our Bill of Rights? The language in both instruments is nearly similar: the two clauses are as follows: " That a well regulated militia being necessary for the security of a free State, the right of the people to keep and bear arms shall not be infringed." " That the free white men of this State shall have a right to keep and bear arms in their common defence." The inquiry is restricted to a single point; but it is not, on that account, wholly free from difficulty. Several of the highest courts of the Union have adjudged it differently, upon the construction of statutes every way like our own; and their opinions are entitled to due consideration. The Court of Appeals of Kentucky has settled the principle against the constitutionality of the act now in question; and in this opinion, if I am not mistaken, the Supreme Courts of Tennessee and Mississippi have concurred. The Supreme Courts of Alabama and Indiana have held a contrary doctrine. They have maintained that the Legislature has the power of prohibiting, by law, the citizen from wearing concealed weapons. I know of no opinion ever delivered of the Supreme Court of the United States, bearing directly upon the point. The question, then, so far as this State is concerned, may be regarded open for investigation, and now brought up for adjudication upon error, for the first time. Both of my brother Judges have just pronounced separate opinions, each maintaining the constitutionality of the act. In their opinions, and the reasons upon which they are based, if I correctly comprehend them, they assert these general propositions: That all just and well regulated governments are instituted for the purpose of establishing justice, preserving domestic tranquillity, providing the necessary means for common defence, securing public liberty, and promoting the general welfare: That, to enable them to perform these high and indispensable obligations, the governments themselves inherently possess, as a portion of their sovereignty, all powers not expressly or necessarily prohibited from them by the grants of their creation: And that, under our frame of government and laws, every citizen has ample remedy and redress for a violation of all his private rights, by means of the public authorities, and to them he is

The State *vs.* Buzzard.

bound to appeal: That the right of the people to keep and bear arms is restricted by the clause of the Constitution before quoted, and limited to the uses and objects therein specified: That it is given for the protection of public liberty, and for common defence; and that the right itself is subject to legislative control: That the words "a well regulated militia being necessary for the security of a free State," and the words "common defence," clearly show the true intent and meaning of these constitutions, and prove that it is a political and not an individual right, and, of course, that the State, in her legislative capacity, has the right to regulate and control it: This being the case, then, the people, neither individually nor collectively, have the right to keep and bear arms. Now, I take the expressions "a well regulated militia being necessary for the security of a free State," and the terms "common defence," to be the reasons assigned for the granting of the right, and not a restriction or limitation upon the right itself, or the perfect freedom of its exercise. The security of the State is the constitutional reason for the guaranty. But when was it contended before, that the reason given for the establishment of a right, or its uninterrupted enjoyment, not only limited the right itself, but restrained it to a single specific object? According to this construction, the right itself is not only abridged, but literally destroyed; and the security of a free State is made to depend exclusively and alone upon the force of the militia. And, in the opinion of one of my brother Judges, it is the militia alone who possess this right, in contradistinction from the mass of the people; and even they cannot use them for private defence or personal aggression, but must use them for public liberty, according to the discretion of the Legislature. According to the rule laid down in their interpretation of this clause, I deem the right to be valueless, and not worth preserving; for the State unquestionably possesses the power, without the grant, to arm the militia, and direct how they shall be employed in cases of invasion or domestic insurrection. If this be the meaning of the Constitution, why give that which is no right in itself, and guaranties a privilege that is useless? This construction, according to the views I entertain, takes the arms out of the hands of the people, and places them in the hands of the Legislature, with no restraint or limitation whatever upon their power, except their own

free will and sovereign pleasure. Are great affirmative grants of political powers to be determined by this technical rule of verbal criticism?.. If so, its rigid application to other portions of the Constitution would erase from its pages many of its most important and salutary provisions. Such a principle, I apprehend, should never be recognized or adopted by any judicial tribunal, in determining the inherent and original rights of the citizen. It goes to abridge, instead of enlarging the constitutional guaranties of personal liberty.

If the Legislature have the custody of the people's arms and the treasury of the State, what becomes of the separation and division of the political powers of the government? Are not those powers united in the same body of magistracy? And if this be the case, the balance of the Constitution is overthrown, and the State then possesses no real security for personal liberty. It is no answer to this argument, to say that the people may abuse the privilege or right of keeping and bearing arms. The Constitution thought and ordained it otherwise; and therefore it was deemed far safer to entrust the right to their own judgment and discretion, rather than to the will or ambition of the Legislature; and this right was excepted out of the general powers of the government, and declared inviolate. Now; if the Legislature had the right to forbid the people from keeping arms secretly, may they not prohibit them from carrying them openly or exposed? and if they could do this, may they not appoint the times and places when and where they shall be borne? And as the construction relied on assumes the principle that they can only be used for a specific and single purpose, then of course the whole subject matter, in regard to keeping and bearing either private or public arms, falls within the power of the Legislature, and they can control or regulate it in any manner that they think proper. This principle I utterly repudiate. I deny that any just or free government upon earth has the power to disarm its citizens, and to take from them the only security and ultimate hope that they have for the defence of their liberties and their rights. I deny this, not only upon constitutional grounds, but upon the immutable principles of natural and equal justice, that all men have a right to, and which to deprive them of amounts to tyranny and oppression. Can it be doubted, that if the Legislature, in moments of high political

The State *vs.* Buzzard.

excitement or of revolution, were to pass an act disarming the whole population of the State, that such an act would be utterly void, not only because it violated the spirit and tenor of the Constitution, but because it invaded the original rights of natural justice? Now, if they are private and not public arms, the Constitution guaranties the right of keeping and bearing them.

The people are secured in their persons, houses, papers, and effects, against unwarrantable searches and seizures; but on probable cause, supported by oath or affirmation. Now, if the Legislature possesses the power claimed for it, it surely has the means of carrying it into effect. Can it, directly or indirectly, invade the sanctuaries of private life and of personal security, by authorizing a public inquisition to search for either open or concealed weapons? Besides, private property cannot be taken for public uses, without due compensation being first made according to law. A man's arms are his private property: how, then, can he be legally deprived of them? If they can forbid him, under the penalty of fine and imprisonment, to keep them concealed or exposed about his person, or on his own premises, although their unrestrained use may be necessary for all the purposes of his ordinary business and of personal defence, then certainly the right of keeping and bearing arms according to his own discretion, is infringed and violated, and his own free will in the management of this property abridged and destroyed.

If it means the public arms, then full power is given by the Constitution to Congress to organize and arm the militia, and prescribe rules for their use and regulation, when mustered into the service of the United States. Now, as full power is given to Congress over the subject, and the same power belongs to the State, which power shall be paramount, and to which of the two governments is entrusted the common defence of the country? Is the grant of the State Constitution void, being repugnant to the Constitution of the United States, or does it abrogate and annul that power? These are questions that are to be found difficult to answer; and I leave their solution to others. But I think it is a fair inference, to presume that any construction, which leads to such consequences, is very likely to be erroneous. I have always been taught to regard the Federal and State governments

as indissolubly connected together, and that their mutual powers and authority acted in perfect harmony and in support of each other, like the great principles incorporated by their enactments. According to the construction I design to give, there can be no conflict between these jurisdictions, nor any discrepancy arising from their action. I hold the doctrine that the Constitution of the United States, and the laws passed in pursuance of its authority, are supreme; and that all State constitutions and laws repugnant to them, are utterly null and void; and that the Constitution and laws of the Federal Government operate directly upon the people and the States, and all are bound to respect and obey them. Again; who compose the militia? Has not the State a right to designate what part or portion of her citizens shall constitute this military corps? Then she can, by indirection, arm only those who are in her interest, or who are swayed by her ambition; and, by denying arms to every other class of her citizens, may she not subjugate the liberties of all, by the very means the Constitution gives for their protection and defence?

By way of testing this principle, suppose the Legislature pass an act, that a man should not keep private arms in his own house secretly, or about his person concealed, although they should be every way necessary, in defence of his life, liberty, or property. Can it be doubted that such an act would be a palpable infraction of the Constitution, as well as an invasion of the natural rights of society? Has not every man a natural and an unalienable right to defend his life, liberty, or property, when a known felony is attempted to be committed upon either by violence or surprise? Can any laws deprive him of this right? Upon what principle has he a right to use force to repel force, and even to slay the aggressor, if he cannot make a successful repulsion otherwise? The laws of the land being unable to protect him, the laws of nature step in, and authorize him to defend himself. Now, it has been often ruled, by the Courts of England, that an act clearly against the laws of natural justice and equity, is not binding; and that if Parliament, which is omnipotent in every thing, pass such acts, they are presumed to have intended no such outrage or wrong. To put this case in its true light—suppose a citizen of the State were indicted upon a charge of murder, and he could

make out a clear case of justifiable homicide, the laws of nature, upon which the laws of society are presumed to be based, instead of punishing, commends him for the act; of course, he stands acquitted of all blame; but, on the trial, the evidence shows that he was compelled to take life with a concealed weapon, and the State thinks proper to indict him for this new offence, which is forbidden by an act of the Legislature; and the proof being clear upon the point, of course he may be convicted and rendered infamous for life. What then becomes of the right of self-defence? Is it not swept away from him by legislative discretion, and the doctrine of self-preservation destroyed, which nature has implanted in the breast of every living creature, and which no laws, either human or divine, can abrogate or annul? In such a case, could there be any hesitation in pronouncing the act that punished him for protecting his own life, absolutely null and void? I think not. All the authorities, upon natural as well as constitutional law, support and prove this position. Would the act forbidding a person to carry concealed weapons be constitutional if he used them in self-defence, and unconstitutional if he did not use them at all, or kept them in a secret manner? If that be the case, then it is the intent, and not the fact of carrying concealed weapons, that makes the law either void or valid. Can so fluctuating a rule be the standard by which to test the constitutionality of the acts of the Legislature? I maintain that the simple fact of a man's keeping and bearing private arms, whether concealed or exposed, is an act innocent of itself, and its freedom secured from all legislative interference. The act being innocent and allowed, cannot be made penal, or prohibited by law. The existence and freedom of a right is one thing, and the culpable and criminal use of it another and a wholly different thing. A right, in itself innocent and guarantied by law, cannot be made illegal or punished as a crime; and the error into which the Court has fallen in the present instance, seems to me to result from confounding these two things, which are wholly separate and independent of each other.

I admit that it is somewhat difficult to determine the exact point where the freedom of a constitutional right stops, and where legislative regulation begins. I take this distinction, however, to run through the whole class of cases; that if the right be innocent of itself, it cannot

be interdicted; but its unlawful exercise, degenerating into licentiousness, is subject to regulation. The principle assumed in this case is, that the fact of private arms being worn concealed is a criminal offence, and capable of being controlled by the Legislature, and that they alone have the right to judge of its criminality. The propositions I do not believe, nor can I subscribe to them. It is true that the Legislature must judge, in the first case, whether the unrestrained freedom or use of a constitutional right is criminal or not; but having passed upon the subject, it then belongs to the Judiciary to examine the question, and to declare the rule of action in regard to it. The citizen, in this instance, complains that his liberty has been improperly restrained, and he has appealed to the Judiciary to shield him from this act of legislative injustice. That department is the last arbiter of his rights; and the point to be settled is, has the Legislature judged wrongfully, or is the mere fact of a person's keeping his private arms concealed, an offence against the State, and liable to be controlled by legislative discretion?

I maintain that the act is not only lawful, but expressly secured by the Constitution, and of course cannot be controlled by ordinary legislation. I admit that, if a man uses his arms improperly, or in an unlawful manner, then it is competent for the Legislature to punish him for the improper and illegal use of them; and it is right to do so; for every one is bound so to exercise his own rights, as not to prejudice those of others. The Legislature, in doing this, does not punish an innocent act, but an unwarrantable one: it does not abridge a natural and constitutional right, or in any manner interfere with its freedom. It merely punishes an unlawful use of a right; and it can do that only when the party has committed, with his own arms, unauthorized aggression upon the person or property of another. And the rights of the Constitution are guarantied upon this principle—that while their perfect freedom and enjoyment are secured, the Constitution utterly forbids any licentious or criminal indulgence in their exercise; for when that is the case, they can no longer be said to be the perfect and inviolable rights of the Constitution, but the unlawful and unauthorized acts of individuals. For example: The freedom of the press, the liberty of speech, and the sacred inviolability of private contracts,

The State *vs.* Buzzard.

and free toleration in religion, are secured to all men. Still, any one or all these rights may be abused or perverted, and the true object or design of the Convention defeated. But does that authorize the Legislature to place restraints or interdicts upon the rights themselves? Certainly not. Such a power will give them up to the discretion of the Legislature, and take them clearly out of the Constitution. They certainly cannot be infringed or violated, or their obligations or value weakened or impaired. A law declaring that a man might write or speak what he pleased, but should not publish or circulate what he had spoken or written; or that he should worship his Creator only on certain days and at appointed places, would surely be unconstitutional, because it would destroy the freedom and sacredness of these rights. But should he, in the exercise of them, commit any unlawful act, and prejudice the rights of others, then he would be answerable for their unwarrantable use and indulgence. For instance, if in writing or speaking, or in the exercise of his religious opinions, he should prejudice or injure the rights and liberties of others, then this wilful perversion or abuse of these rights becomes a criminal act, and consequently should be controlled. The liberty of speech and of the press, and the freedom of religious toleration, are utterly incompatible, in the true constitutional meaning of those terms, with their licentiousness or criminal indulgence; and these latter or improper acts are in no manner connected with the invaluable franchises out of which they flow. Now, the right of the people to keep and bear arms is as free and unfettered, and as inviolable and important, as the liberty of speech and of the press, or the freedom of religious toleration; and it stands upon precisely the same constitutional ground, and supported by like reasons.

*Sic utere tuo, non lædas alienum,* is a maxim that runs through the whole body of the English common law, and pervades every part of our entire system of jurisprudence. Our Constitution and laws, construed by this principle, cause all the great and essential rights of civil and religious liberty to coalesce and blend together for the improvement and happiness of our species. If it is disregarded or overlooked, the constitutional guarantees become contradictory or hostile to each other: thence the necessity and importance of the rule in the construction of all laws. The application of this governing rule in the

6 .

construction of laws, demonstrates and explains the reasons why it would be unlawful so to keep arms or ammunition of any kind, as to endanger the lives or property of others; and it solves the supposed difficulty, that if there is no limitation or restriction of the power of keeping and bearing arms, then the State has no authority to disarm a criminal for any offence whatever. When a citizen breaks his covenant with his government, he forfeits the protection of her laws; and of course this supersedes or destroys many of his municipal rights and political franchises, which he otherwise would be entitled to receive at her hands.

It is further contended that the right should be restricted, because it is given alone for the security of a free State, which means nothing more or less than the defence of public liberty. Now, what constitutes the security of a free State, or what is public liberty? Does the security of a free State consist alone in repelling foreign aggression, or quelling domestic insurrection? How is the public liberty of a State to be preserved, and what is it? These inquiries seem to me to lead to different results, as we view the subject from different points. The security of a free State, as I imagine, depends not only in upholding all its political institutions, but in sacredly performing all its legal and constitutional obligations, both to the Government and to the people. Public liberty can only be secured and perpetuated by preserving inviolable the personal franchises and immunities of the citizen, as well as guarding and protecting the sovereign attributes of the State. To suppose that public liberty cannot be in danger, except from a foreign foe or internal disorder, is virtually to deny the importance and necessity of written constitutions. If there was no fear of our own rulers, why impose restraints upon them, and why commit the guardianship and care of the great principles of civil and religious liberty to separate and independent departments of the Government, and bind each, by the most solemn injunctions, to preserve and defend them? And why trust the Constitution, in the last resort, to the interpretation of the Courts, to expound its meaning and declare its will? For this plain and obvious reason: because the Judiciary has few temptations to err, and possesses neither patronage or power, to make it popular or dangerous. I cannot separate the political freedom of the State

The State *vs.* Buzzard.

from the personal rights of its citizens. They are indissolubly bound up together in the same great bond of union, and, to my mind, they are incapable of division. The distinction may be in names, but it cannot be in the nature and essence of things. It is certainly true, that, in one sense of the term, the political rights of the State and the personal privileges of the citizen may be contradistinguished from each other. There is a certain class of rights, which belongs to the State in her corporate character, and cannot be exercised except through the intervention of her authority. By far the most important and largest of the rights of the Constitution appertain exclusively to the person of the citizen, and concern the inherent rights of life, liberty, and property. Many of these rights lie behind the Constitution, and existed antecedent to its formation and its adoption. They are embodied in its will, and organized by its power, to give them greater sanctity and effect. They are written, that they may be understood and remembered; and then declared inviolate and supreme, because they cannot be weakened or invaded without doing the Government and citizen manifest injustice and wrong. Among these rights, I hold, is the privilege of the people to keep and to bear their private arms, for the necessary defence of their person, habitation, and property, or for any useful or innocent purpose whatever. We derive this right from our Anglo-Saxon ancestors, and under the form of that government it has ever been regarded as sacred and inviolable. It is of great antiquity and of invaluable price. Its necessary operation, in times of convulsion and of revolution, has been the only means by which public liberty or the security of free States has been vindicated and maintained. Here, the principles of equal and natural justice, as well as the obvious meaning and spirit of the Constitution, have placed it above legislative interference. To forbid a citizen, under the penalty of fine and imprisonment, to carry his own private arms about his person, in any manner that he may think proper for his security or safety, is, in my opinion, an unauthorized attempt to abridge a constitutional privilege, and therefore I hold the law in question to be of no effect.

[But the majority of the Court being of a different opinion, the judgment was reversed.]