THOMAS, Circuit Judge,
dissenting:
In its landmark decision in Heller, the Supreme Court held that a complete ban on handgun possession in the home violated the Second Amendment. District of Columbia v. Heller, 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In doing so, it reminded us that: “the right secured by the Second Amendment is not unlimited” and that it “was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.” Id. at 626, 128 S.Ct. 2783. Significantly for our case, the Court then specifically discussed restrictions on carrying concealed weapons, explaining that “the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues.” Id. The Court then emphasized that “nothing in our opinion should be taken to cast doubt on longstanding prohibitions,” which it labeled as “presumptively lawful.” Id. at 626-27 & n. 26, 128 S.Ct. 2783. Heller’s pronouncement is consistent with the Supreme Court’s prior observation that “the right of the people to keep and bear arms ... is not infringed by laws prohibiting the carrying of concealed weapons.” Robertson v. Baldwin, 165 U.S. 275, 281-82, 17 S.Ct. 326, 41 L.Ed. 715 (1897).
This case involves California’s “presumptively lawful” and longstanding restrictions on carrying concealed weapons in public and, more specifically, an even narrower question: the constitutionality of San Diego County’s policy of allowing persons who show good cause to carry concealed firearms in public. When we examine the justification provided for the policy, coupled with Heller’s direction, our conclusion must be that the County’s policy is constitutional.
Unfortunately, the majority never answers the question posed. Instead, in a sweeping decision that unnecessarily decides questions not presented, the majority not only strikes down San Diego County’s concealed carry policy, but upends the entire California firearm regulatory scheme. The majority opinion conflicts with Heller, the reasoned decisions of other Circuits, and our own case law.
Therefore, I must respectfully dissent.
I
We are not asked in this case to determine the reach of the Second Amendment outside the home or to evaluate the entire *1180 ty of California’s handgun regulatory scheme. Rather, the narrow questions presented in this case are: (1) Does the scope of the Second Amendment extend to protect the concealed carrying of handguns in public, and (2) if so, does San Diego County’s policy of allowing public concealed weapon carry upon a showing of good cause unconstitutionally infringe on that right?
Second Amendment jurisprudence has rapidly evolved in the last several years, commencing with the Supreme Court’s groundbreaking decisions in Heller and McDonald v. City of Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). Although these cases are of recent origin, Heller and McDonald, along with decisions of our sister circuits, have provided an analytical framework for examining Second Amendment challenges, which we recently distilled in United States v. Chovan, 735 F.3d 1127, 1136 (9th Cir.2013).
The Supreme Court has not as yet defined the extent to which the Second Amendment applies outside the home, and that issue has been the subject of intense debate in the intermediate appellate courts.[1] As Judge Wilkinson has observed, the question of the extent of the Second Amendment’s reach beyond the home post-Heller is “a vast terra incognita that courts should enter only upon necessity and only then by small degree.” United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir.2011) (Wilkinson, J., concurring).
In this changing landscape, with many questions unanswered, our role as a lower court is “narrow and constrained by precedent,” and our task “is simply to apply the test announced by Heller to the challenged provisions.” Heller v. District of Columbia, 670 F.3d 1244, 1285 (D.C.Cir.2011) (“Heller II”).
In this case, we are not presented with a broad challenge to restrictions on carrying firearms outside the home. Instead, we are asked a much more circumscribed question concerning regulation of public carry of concealed firearms. As the Supreme Court emphasized in Heller, that issue has a much different and unique history than the Second Amendment challenge at issue in Heller, and the history of concealed carry restrictions differs from the history of open carry regulations. Those differences are crucial to resolution of the issues in this case.
Simply put, concealed carry presents an entirely different Second Amendment issue from possessing handguns in the home for self-defense. As the Supreme Court recognized in Heller, courts and state legislatures have long recognized the danger to public safety of allowing unregulated, concealed weapons to be carried in public. Indeed that danger formed part of the rationale for allowing police “stop and frisks” in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As Justice Harlan observed in that case, “[cjoncealed weapons create an immediate and severe danger to the public.” Id. at 31-32, 88 S.Ct. 1868.
Under Heller and Chovan, we employ a two-part inquiry when reviewing Second Amendment challenges to firearm regulations. “The first question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment’s guarantee.” Chovan, 735 F.3d at 1134 (citing United States v. Ches *1181 ter, 628 F.3d 673, 680 (4th Cir.2010) (internal quotation marks and citation omitted)).
“This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification.” Chester, 628 F.3d at 680. “If it was not, then the challenged law is valid.” Id. “If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny.” Id.
II
The first question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment’s guarantee. Chovan, 735 F.3d at 1134. The Supreme Court has instructed that the core of the Second Amendment is “the right of law-abiding, responsible citizens to use arms in defense of hearth and home.” Heller, 554 U.S. at 635, 128 S.Ct. 2783.[2] Carrying concealed weapons in public by definition does not inherently involve defense of hearth and home, so the core of the Second Amendment is not implicated. Thus, we must begin by examining the conduct at issue in this case using the analysis prescribed by Heller and Chovan.
A
The majority’s first — and crucial — mistake is to misidentify the “conduct at issue.” Chester, 628 F.3d at 680. The majority frames the question as “whether a responsible, law-abiding citizen has a right under the Second Amendment to carry a firearm in public for self-defense.” This is certainly an important issue, but it is not the question we are called upon to answer. The Plaintiffs are not seeking a general license to carry firearms in public for self-defense — they are seeking a license to carry concealed firearms in public.
*1182 Properly identifying the “conduct at issue” is the lynchpin of the two-step inquiry because the first question we ask, as with all constitutional challenges based on enumerated rights, is “whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment’s guarantee.” Id. (emphasis added). The Bill of Rights guarantees that individuals may engage in specified protected conduct. Challenges based on the Bill of Rights seek to vindicate its guarantees by striking down laws that interfere with protected conduct. In the context of firearm regulations, “[t]he specific constitutional challenge thus delineates the proper form of relief and clarifies the particular Second Amendment restriction that is before us.” Peterson, 707 F.3d at 1209.
Thus, the proper analytic approach is to answer the historical inquiry as to whether carrying a concealed weapon in public was understood to be within the scope of the right protected by the Second Amendment at the time of ratification. This examination must be approached with caution, bearing in mind Justice Stevens’ admonition that “[i]t is not the role of federal judges to be amateur historians.” McDonald, 130 S.Ct. at 3119 (Stevens, J., dissenting). Care is also required to avoid the danger inherent in any exercise of historiography: that we assemble history to fit a pre-conceived theory. As judges undertaking this examination, we must also set aside any personal views we may have on the important, but contentious, policy question of firearm regulation.
B
Heller instructed us to look to the Second Amendment’s historical background to understand its scope. 554 U.S. at 592, 128 S.Ct. 2783; see also Chester, 628 F.3d at 680. In its own consideration of the Second Amendment’s history, Heller identified a catalogue of historical materials bearing on the provision’s meaning. In examining those same sources — from the history of the right in England to the interpretations of nineteenth-century American courts and commentators — we must conclude that carrying concealed weapons has routinely been restricted, and has often been outright banned. As the majority fairly acknowledges at several points in its extensive historical survey, nearly every source cited in Heller concluded that carrying concealed weapons is not part of the right to bear arms and that restrictions on carrying concealed weapons therefore do not offend the Second Amendment.
Because of the importance attached to the historical sources by the Supreme Court in Heller, it is necessary to examine them in some detail.
1
History of the Right to Bear Arms in England. Because the Second Amendment “codified a right inherited from our English ancestors,” the Supreme Court looked to the history of the right in England to divine whether the Second Amendment protected an individual or a collective right. Heller, 554 U.S. at 592-95, 599, 128 S.Ct. 2783 (internal quotation marks and citation omitted). A look at the same history suggests that the “right inherited from our English ancestors” did not include a right to carry concealed weapons in public. See id. at 592-95, 128 S.Ct. 2783.
Restrictions on the carrying of open and concealed weapons in public have a long pedigree in England. The fourteenth-century Statute of Northampton provided that “no man” shall “go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain *1183 to forfeit their armour to the King, and their bodies to prison at the King’s pleasure.” 2 Edw. 3, c. 3 (1328). In Sir John Knight’s Case, an English court explained that the statute had two purposes. 87 Eng. Rep. 75 (K.B.1686). One “was to punish people who go armed to terrify the King’s subjects.” Id. The other was to codify the common law, which prohibited the described conduct because it promoted the sense that “the King [was] not able or willing to protect his subjects.” Id. Ultimately, the court acquitted Sir John Knight under the statute’s exception for the king’s ministers and servants and anyone otherwise authorized “to keep the peace.” 2 Edw. 3, c. 3 (1328).
Following the enactment of the Statute of Northampton, English monarchs repeatedly called on their officials to enforce it. See Patrick Charles, The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review, 60 Clev. St. L.Rev. 1,13-30 (2012). For example, in 1579, Queen Elizabeth I called for the enforcement of the Statute of Northampton and other laws prohibiting the carrying of “Dagges, Pistolles, and such like, not on[ ]ly in Cities and Townes, [but] in all partes of the Realme in common high[ways], whereby her Majesties good qu[i]et people, desirous to live in peaceable manner, are in feare and danger of their lives.” Id. at 21 (internal quotation marks and citation omitted). In 1594, the Queen again called for the enforcement of gun control laws because her subjects were being terrorized by the carrying of arms, including concealed “pocket Dags,” in public. Id. at 22 (internal quotation marks and citation omitted).
More than three centuries after the enactment of the Statute of Northampton, William and Mary declared “[t]hat the subjects which are Protestants may have arms for their defence suitable to their Conditions, and as allowed by Law.” 1 W. & M., 2d sess., c. 2, § 7 (1689). This provision of the English Bill of Rights “has long been understood to be the predecessor to our Second Amendment.” Heller, 554 U.S. at 593, 128 S.Ct. 2783. But despite England’s adoption of this right, the Statute of Northampton remained in full force and was still understood to sharply limit the freedom to carry arms in public. In his guide for British constables, Robert Gard-iner interpreted the statute to mean that
if any Person shall Ride or go Arm’d offensively ... in Fairs or Markets or elsewhere, by Day or by Night, in affray of Her Majesties Subjects, and Breach of the Peace; or' wear or carry any Daggers, Guns or Pistols Charged; the Constable upon sight thereof, may seize and take away their Armour and Weapons, and have them apprized as forfeited to Her Majesty.
Robert Gardiner, The Compleat Constable, 18-19 (1708) (emphasis added). Notably, Gardiner distinguished between going armed offensively in breach of the peace, on the one hand, and merely wearing or carrying arms, on the other. Id. This distinction suggests that he considered carrying weapons in public a violation of the statute, regardless of whether doing so actually breached the peace. Charles, supra, at 25-28. Blackstone confirmed this understanding:
The offense of riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the Statute of Northampton, upon pain of forfeiture of the arms, and imprisonment during the king’s pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour.
*1184 4 William Blackstone, Commentaries on the Laws of England 148-49 (1st ed. 1769) (citations omitted). According to Blackstone, the Statute of Northampton proscribed the public carrying of “dangerous or unusual” weapons because doing so terrified the people. Id. Thus, in England, as in ancient Athens, it was an offense simply to go armed — or, at least, armed in a dangerous manner — in public areas. Id.
Certainly, this history does not provide a ready or easy answer to this case. Indeed, history — especially history as old as that recited here — is often ambiguous or contradictory. Nonetheless, from what we know, we can be sure that “the right we inherited from our English ancestors” left ample leeway for restrictions on the public carrying of firearms in the interest of public safety.
2.
Post-Ratification Commentary. The Heller Court relied heavily on the post-ratification commentary of St. George Tucker, William Rawle, and Joseph Story. See 554 U.S. at 605-10, 128 S.Ct. 2783. Unfortunately, these commentators revealed little of their opinions about concealed weapons. Still, Rawle wrote that the Second Amendment right “ought not ..., in any government, to be abused to the disturbance of the peace.” William Rawle, A View of the Constitution of the United States 123 (1825). Heller cited this statement when it noted that, “[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the [Second Amendment] right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.” 554 U.S. at 626, 128 S.Ct. 2783. At the least, Heller's language suggests that there is room for restricting certain manners of carrying firearms where they threaten public peace and safety.
3
Pre-Civil War State Constitutions and Legislation. To confirm its understanding of the Second Amendment’s guarantee, the Heller Court looked to state legislation and state constitutional provisions from the Founding Era and subsequent generations. 554 U.S. at 600-03, 128 S.Ct. 2783. These same sources support the conclusion that publicly carrying concealed weapons falls outside the Second Amendment’s scope.
By the Founding era, three of the original thirteen states — Massachusetts, North Carolina, and Virginia — had expressly adopted the Statute of Northampton. Charles, supra, at 31-32 & n.166. There is no indication that in doing so these states meant to exclude the longstanding interpretations of the statute.
In the early nineteenth century, states increasingly limited the carrying of concealed firearms.[3] And “[m]ost states enacted laws banning the carrying of concealed weapons.”[4] Kachalsky, 701 F.3d at *1185 95; see also Saul Cornell & Nathan DeDi-no, A Well Regulated Right: The Early American Origins of Gun Control, 73 Ford. L.Rev. 487, 502-16 (2004). Georgia banned the sale of concealable weapons altogether, and Tennessee promptly followed suit by banning the sale of bowie knives. Act of Dec. 25, 1837, 1837 Ga. Laws 90; Act of Jan. 27, 1838, ch. 137, 1837-38 Tenn. Pub. Acts 200-01. Notably, some of these bans contained only narrow exceptions, or no exceptions at all. For example, Ohio’s concealed-carry ban allowed a narrow exception for those carrying a weapon in connection with their lawful employment where a “prudent man” would carry weapons in defense of himself, his family, or his property. 1859 Ohio Laws at 56-57. By contrast, Virginia’s ban had no exceptions at all, even if the defendant was acting in self-defense when using the concealed weapon. 1838 Va. Acts ch. 101 at 76.
4
Pre-Civil War Case Law. The Heller Court relied heavily on several early-nineteenth-century court cases interpreting the Second Amendment and state analogues. 554 U.S. at 610-14, 128 S.Ct. 2783. For example, when the Court pointed to prohibitions on carrying concealed weapons as a prime example of how “the right secured by the Second Amendment is not unlimited,” it specifically cited the 1846 Georgia case Nunn v. State and the 1850 Louisiana case State v. Chandler. Id. at 626, 128 S.Ct. 2783. Those cases, and others relied on in Heller, provide some of the strongest evidence that the Second Amendment does not protect the carrying of concealed firearms in public.
In State v. Mitchell, 3 Blackf. 229 (Ind. 1833), the Indiana Supreme Court succinctly declared “that the statute of 1831, prohibiting all persons, except travelers, from wearing or carrying concealed weapons, is not unconstitutional.” Id.
In the 1840 case of State v. Reid, the defendant — who had been convicted under Alabama’s Act of February 1, 1839, which made it a crime for any person to “carry concealed about his person, any species of fire arms” or “any other deadly weapon”— challenged his conviction under Alabama’s arms-bearing constitutional guarantee. 1 Ala. 612, 614-15, 616 (1840) (cited in Heller, 554 U.S. at 629, 128 S.Ct. 2783). The Alabama Supreme Court began its analysis of the defendant’s challenge by considering the history of the right to bear arms in England, including the English Bill of Rights, which the court considered to be the progenitor of the right to bear arms in Alabama. Id. at 615. After examining this history, the court held that Alabama’s concealed firearm ban did not “trench upon the constitutional rights of the citizen.” Id. at 616. The court reasoned that Alabama’s Second Amendment analogue “neither expressly nor by implication, denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne.” Id. Just as the English Bill of Rights allowed Parliament *1186 “to determine what arms shall be borne and how,” the Alabama constitution permitted the legislature to determine that carrying concealed weapons was not a proper mode of exercising the right to bear arms. Id. The majority cites Reid as support for the theory that a ban on concealed weapons carry would not be permitted if restrictions on public carry went too far. But Reid plainly does not stand for that proposition. It rejected the “evil practice of carrying weapons secretly,” id. at 616, and supported the power of the legislature to proscribe the “manner in which arms shall be borne,” id. Reid cannot be construed as supporting a Second Amendment right to carry concealed weapons in public.
In the same year as Reid, the Tennessee Supreme Court considered a similar challenge to the constitutionality of a law criminalizing the carrying of concealed weapons. Aymette v. State, 21 Tenn. 154 (1840) (cited in Heller, 554 U.S. at 613, 128 S.Ct. 2783). As in Reid, the court first considered the history of the right to bear arms in England, including the English Bill of Rights under William and Mary. Id. at 156, 157. Based on this history, the court concluded that the Tennessee legislature was well within its powers to criminalize the carrying of concealed weapons:
To hold that the Legislature could pass no law upon this subject by which to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms, would be to pervert a great political right to the worst of purposes, and to make it a social evil of infinitely greater extent to society than would result from abandoning the right itself.
Id. at 159.[5] The court’s opinion also included the following passage, which is quite relevant in assessing its view of legislative power:
Súpose [sic] it were to suit the whim of a set of ruffians to enter the theatre in the midst of the performance, with drawn swords, guns, and fixed bayonets, or to enter the church in the same manner, during service, to the terror of the audience, and this were to become habitual; can it be that it would be beyond the power of the Legislature to pass laws to remedy such an evil? Surely not.... The convention, in securing the public political right in question, did not intend to take away from the Legislature all power of regulating the social relations of the citizens upon this subject.
Id. at 159.
The majority concedes that Aymette does not support a Second Amendment right to bear concealed weapons, but argues that it is relevant to other Second Amendment rights. However, if the “conduct at issue” here-the right to bear concealed weapons in public-is not protected by the Second Amendment, the existence of other rights is not relevant to our inquiry.
In State v. Buzzard, 4 Ark. 18 (1842), the Arkansas Supreme Court held that the Arkansas law banning the wearing of concealed weapons was not contrary to either the Arkansas or United States Constitution. Id. at 28. As the Chief Justice wrote:
The act in question does not, in my judgment, detract anything from the *1187 power of the people to defend their free state and the established institutions of the country. It inhibits only the wearing of certain arms concealed. This is simply a regulation as to the manner of bearing such arms as are specified. The practice of so bearing them the legislative department of the government has determined to be wrong, or at least inconsistent with sound policy. So far, that department had a discretion in regard to the subject, over which the judiciary, as I conceive, has no control, and therefore, the duty of the courts must be the same, whether the policy of the law be good or bad. In either event it is binding, and the obligation of the courts to enforce its provisions, when legally called upon to do so, is imperative.
Id. at 27.
In the 1846 case of Nunn v. State, the defendant — who had been convicted for carrying a pistol in violation of Georgia’s Act of December 25, 1837 — challenged his conviction under the Second Amendment and Georgia’s analogous constitutional provision. 1 Ga. at 245, 247 (cited in Heller, 554 U.S. at 612, 626, 128 S.Ct. 2783). After considering State v. Reid and the Kentucky case Bliss v. Commonwealth, the Georgia Supreme Court concluded that a law prohibiting the carrying of concealed weapons does not violate the right to keep and bear arms. Nunn, 1 Ga. at 247, 251. Relying on Reid, the court explained
that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, ... it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void....
Id. at 251. Because the criminal charges had not specified the manner in which the defendant carried his pistol, the court reversed his conviction. Id.
Nunn plainly does not support the notion that bearing concealed weapons falls within the protection of the Second Amendment. It stands for precisely the opposite proposition. Nonetheless, the majority embraces Nunn as supporting other Second Amendment rights. It argues that, if those other rights are restricted, then the legislature could not prohibit concealed carry. However, Nunn does not say that. Its holding is that Georgia’s analogous constitutional protection of the right to bear arms did not include the right to carry concealed weapons.[6]
Finally, in State v. Chandler, the Louisiana Supreme Court joined its counterparts *1188 in Alabama, Tennessee, and Georgia to hold that a state law criminalizing the carrying of concealed weapons did not conflict with the Second Amendment. 5 La.Ann. 489, 490 (1850) (cited in Heller, 554 U.S. at 613, 626, 128 S.Ct. 2783). According to the court, the statute “became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons.” Id. at 489-90. It further explained that the statute
interfered with no man’s right to carry arms ... in full open view, which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.
Id. at 490 (internal quotation marks omitted). Eight years later, the Louisiana Supreme Court reaffirmed its holding, explaining that the state’s concealed-carry ban did not violate the Second Amendment because it “prohibit[ed] only a particular mode of bearing arms which is found dangerous to the peace of society.” State v. Jumel, 13 La.Ann. 399, 399-400 (1858) (emphasis in original).
To be sure, there was at least one state high court whose voice was out of tune with this nineteenth-century chorus. In the 1822 case of Bliss v. Commonwealth, the Kentucky high court reversed the defendant’s conviction for carrying a concealed weapon (a sword in a cane). 12 Ky. at 93 (cited in Heller, 554 U.S. at 585 n. 9, 128 S.Ct. 2783). The court held that under the Kentucky constitution, any restraint or regulation on the right to bear arms, including regulations on the manner of carry, were void. Id. at 92, 93. Therefore, the court saw no difference between acts forbidding the carrying of concealed weapons and acts forbidding the carrying of weapons openly. Id.
But the reign of Bliss was short-lived in Kentucky. The ruling was met with disbelief by the Kentucky legislature. Indeed, “[a] committee of the Kentucky House of Representatives concluded that the state’s Supreme Court had misconstrued the meaning of the state’s constitutional provision on arms bearing.” Saul Cornell, The Early American Origins of the Modem Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History, 17 Stan. L. & Pol’y Rev. 571, 586 (2006) (citing Journal of the Kentucky House of Representatives 75. (Frankfort, Ky.1837)). It issued a stinging criticism of Bliss. Id. And Kentucky eventually amended its constitution specifically to overrule Bliss. See id. at 587; Ky. Const, of 1850 art. XIII, § 25 (“[T]he rights of the citizens to bear arms in de-fence of themselves and the State shall not be questioned; but the General Assembly may pass laws to prevent persons from carrying concealed arms.”). As Professor Cornell concluded, the holding of Bliss was “bizarre and out of touch with mainstream legal and constitutional thinking in the early Republic.” Cornell, 17 Stan. L. & Pol’y Rev. at 586.
Bliss was clearly a judicial outlier. The courts in Buzzard, Reid, Aymette, and Nunn all considered Bliss’s conclusions and expressly rejected them. Nunn, 1 Ga. at 247-48, 251; Aymette, 21 Tenn. at 160; Reid, 1 Ala. at 617; Buzzard, 4 Ark. at 25-26. Reid speculated that Bliss’s solitary position was the result of the unique language of Kentucky’s constitution. 1 Ala. at 619. Aymette more directly questioned the correctness of Bliss’s reasoning, explaining that “there is a manifest distinction” between carrying arms secretly and carrying arms openly. 21 Tenn. at 160. *1189 Buzzard pointedly disagreed with Bliss, observing:
However captivating such arguments may appear upon a merely casual or superficial view of the subject, they are believed to be specious, and to rest upon premises at variance with all the fundamental principles upon which the government is based; and that, upon a more mature and careful investigation, as to the object for which the right was retained their fallacy becomes evident. The dangers to be apprehended from the existence and exercise of such right, not only to social order, domestic tranq-uillity and the upright and independent administration of the government, but • also to the established institutions of the country, appears so obvious as to induce the belief that they are present to every intelligent mind, and to render their statement here unnecessary.
4 Ark. at 25-26.
In short, Bliss does not in any way alter the great weight of early-nineteenth century cases holding that carrying concealed weapons is conduct that falls outside the bounds of Second Amendment protection.
5
Post-Civil War Legislation and Commentary. Even though laws enacted after the Civil War were far removed from the Founding Era, the Heller Court found them instructive for discerning the Second Amendment’s nature. 554 U.S. at 614, 128 S.Ct. 2783. Likewise, the Court looked to post-Civil War commentaries for illumination. Id. at 616-19, 128 S.Ct. 2783. These sources further cemented the understanding of the early-nineteenth-century courts that concealed carry is not protected by the Second Amendment.
By the latter half of the nineteenth century, most states had enacted bans or limitations on the carrying of concealed weapons. See Kachalsky, 701 F.3d at 95 & n. 21 (collecting statutes). During that time, three states and one territory even passed total bans on carrying of pistols, whether concealed or open. Id. at 90 (citing Ch. 96, §§ 1-2, 1881 Ark. Acts at 191-92; Act of Dec. 2, 1875, ch. 52, § 1, 1876 Wyo. Terr. Comp. Laws, at 352; Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws at 25; Ch. 13, § 1,1870 Tenn. Acts at 28).
Despite these widespread restrictions on the carrying of concealed weapons, legal commentators saw no Second Amendment violations. John Pomeroy wrote that the Second Amendment’s “inhibition is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons.” John Norton Pomeroy, An Introduction to the Constitutional Law of the United States 152-53 (1868) (cited in Heller, 554 U.S. at 618, 128 S.Ct. 2783). Like the Court in Heller, he compared the Second Amendment to the First: “The clause is analogous to the one securing freedom of speech and of the press. Freedom, not license, is secured; the fair use, not the libellous abuse, is protected.” Id.; see Heller, 554 U.S. at 618, 128 S.Ct. 2783.
In his edition of Kent’s Commentaries, Justice Holmes noted a “great difference of opinion” among the state courts on whether prohibitions on carrying concealed weapons were constitutional. 2 James Kent, Commentaries on American Law *340 n.2 (Oliver Wendell Holmes, Jr. ed., 12th ed.1873) (cited in Heller, 554 U.S. at 618, 626, 128 S.Ct. 2783). After summarizing the state courts’ cases (including those discussed above), he sided with the courts that found such prohibitions constitutional: “As the practice of carrying concealed weapons has been often so atrociously abused, it would be very desirable, on principles of public policy, that the respective legislatures should have the competent power to secure the public peace, and *1190 guard against personal violence by such a precautionary provision.” Id.
George Chase, like Justice Holmes, concluded in The American Students’ Blackstone (1884) that concealed weapons bans were necessary to ensure public safety, and that they were widely deemed lawful: “[I]t is generally held that statutes prohibiting the carrying of concealed weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms in a particular manner, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence.” Chase, supra, at 85 n. 11 (cited in Heller, 554 U.S. at 626, 128 S.Ct. 2783) (emphasis in original).
John Ordronaux wrote that although “[t]he right to bear arms has always been the distinctive privilege of freemen,” the Second Amendment does not limit a state’s power to “enact[ ] laws regulating the manner in which arms may be carried. Thus, the carrying of concealed weapons may be absolutely prohibited without the infringement of any constitutional right.” John Ordronaux, Constitutional Legislation in the United States 241 (1891) (cited in Heller, 554 U.S. at 619, 128 S.Ct. 2783) (some emphasis added).
In addition to these commentators cited in Heller, the majority recognizes other commentators who concluded that the Second Amendment was not concerned with concealed carry. For example, Henry Campbell Black wrote simply that “[t]he right to bear arms is not infringed by a state law prohibiting the carrying of concealed deadly weapons.” Henry Campbell Black, Handbook of American Constitutional Law 463 (1895). And the editor of an 1897 edition of Blackstone wrote that “the right of carrying arms as secured by the U.S. Constitution, and generally by State constitutions, does not include the habitual carrying of concealed deadly weapons by private individuals.” 1 William Blackstone, Commentaries on the Laws of England 144 n.91 (William Draper Lewis ed., 1897).
6
Given this extensive history, it is not surprising that in 1897 the Supreme Court endorsed the view that carrying concealed weapons is not protected conduct under the Second Amendment. Robertson, 165 U.S. at 281-82, 17 S.Ct. 326. In rejecting a challenge under the Thirteenth Amendment, the Court noted that the freedoms enumerated in the Bill of Rights are subject to “certain well-recognized exceptions.” Id. at 281, 17 S.Ct. 326. As an example of such a well-recognized exception, the Court explained that “the right of the people to keep and bear arms ... is not infringed by laws prohibiting the carrying of concealed weapons.” Id. at 281-82, 17 S.Ct. 326. Although this passage is old, no case, including Heller, has ever called it into question.
Most of our sister circuits that have considered the question have reached similar conclusions. In Drake v. Filko, 724 F.3d 426 (3d Cir.2013), the Third Circuit considered the New Jersey Handgun Permit Law, which required persons who wished to carry a handgun in public to apply for permit and show “justifiable need.” Against a Second Amendment challenge, the Third Circuit held that “the requirement that applicants demonstrate a ‘justifiable need’ to publicly carry a handgun for self-defense qualifies as a ‘presumptively lawful,’ ‘longstanding’ regulation and therefore does not burden conduct within the scope of the Second Amendment’s guarantee.” Id. at 429-30.
In Peterson, the Tenth Circuit considered a Second Amendment challenge to Colorado’s concealed handgun licensing re *1191 gime, which restricted the issuance of licenses to Colorado residents. The Tenth Circuit concluded that “[t]here can be little doubt that bans on the concealed carrying of firearms are longstanding.” 707 F.3d at 1210. After conducting an historical analysis, the Court concluded that “the Second Amendment does not confer a right to carry concealed weapons.” Id. at 1211.
Although the Second Circuit did not reach the question of the scope of the Second Amendment, it concluded that “state regulation of the use of firearms in public was ‘enshrined with[in] the scope’ of the Second Amendment when it was adopted” and that “extensive state regulation of handguns has never been considered incompatible with the Second Amendment.” Kachalsky, 701 F.3d at 96, 100.
D
In sum, employing the analysis prescribed by the Supreme Court, the answer to the historical inquiry is clear: carrying a concealed weapon in public was not understood to be within the scope of the right protected by the Second Amendment at the time of ratification. This conclusion is in accord with Heller* s recognition that there were “longstanding prohibitions” on firearms that were “presumptively lawful,” 544 U.S. at 626-27 & n. 26, 125 S.Ct. 2007, and the Supreme Court’s observation in Robertson that “the right of the people to keep and bear arms ... is not infringed by laws prohibiting the carrying of concealed weapons,” 165 U.S. at 281-82, 17 S.Ct. 326. See Peterson, 707 F.3d at 1211. Because the right asserted is not protected by the Second Amendment, our inquiry should be at an end: San Diego County’s good cause requirement for a person to carry a concealed weapon in San Diego County is constitutional. Chester, 628 F.3d at 680.
III
Because the act of carrying concealed weapons in public is not protected by the Second Amendment, it is unnecessary to reach the second part of the Second Amendment inquiry. However, even if we were to assume that San Diego County’s good cause requirement implicates the Second Amendment, I would conclude that the San Diego County policy easily passes constitutional muster.
The‘second Chovan inquiry is whether the challenged government action survives means-end scrutiny under the appropriate level of review. Chovan, 735 F.3d at 1136. In Second Amendment analysis, the level of scrutiny depends on “ ‘(1) how close the law comes to the core of the Second Amendment right,’ and ‘(2) the severity of the law’s burden on the right.’ ” Id. at 1138 (quoting Ezell v. City of Chicago, 651 F.3d 684, 703 (7th Cir.2011)).
The core of the Second Amendment right is “the right of law-abiding, responsible citizens to use arms in defense of hearth and home.” Heller, 554 U.S. at 635, 128 S.Ct. 2783. Carrying concealed weapons in public does not implicate the core right. Assuming, for argument’s sake, that the burden placed in this case on whatever Second Amendment rights extend outside the home is substantial, then application of intermediate scrutiny is appropriate. Chovan, 735 F.3d at 1138.
Surviving intermediate scrutiny requires “(1) the government’s stated' objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective.” Id. at 1139 (citing Chester, 628 F.3d at 683).[7]
*1192 The County claims that its application of the good cause requirement protects the public peace and protects “the safety of the public from unknown persons carrying concealed, loaded firearms.” As the Supreme Court has repeatedly made clear, public safety and preventing crime are important, indeed compelling, government interests. See, e.g., Schenk v. Pro-Choice Network of W. N.Y., 519 U.S. 357, 376, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (public safety is a significant government interest); United States v. Salerno, 481 U.S. 739, 750, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (preventing crime is a compelling government interest).
The County argues that the good cause requirement helps protect public safety because it reduces the number of concealed firearms circulating in public. According to the County, reducing the number of guns carried in public ensures public safety by, among other things:
• Limiting the lethality of violent crimes. According to an expert declaration filed in support of the County’s motion for summary judgment, even though the general availability of guns may or may not influence the absolute number of violent crimes, when guns are used in such crimes it is much more likely that the crime will result in the death of the victim.
• Limiting the ability of criminals to legally take advantage of stealth and surprise.
■ Protecting police officers and ensuring their practical monopoly on armed force in public. According to the County, more than ninety percent of police officers who are killed in the line of duty are killed with guns.
• Limiting the danger to other members of the public. The decision to carry a concealed firearm in public exposes other people to increased risk of injury or death without their knowledge or control.
• Limiting the likelihood that minor altercations in public will escalate into fatal shootings.
The County presented data showing that the more guns are carried in public, the more likely it is that violent crimes will result in death and detailing the specific risks posed by concealed weapons.
Obviously, the Plaintiffs disagree with the efficacy of the policy to achieve these goals, and have marshaled evidence challenging conventional wisdom about the correlation between violence and the prevalence of handguns. But ours is not the forum in which to resolve that debate. Rather, we owe “substantial deference to the predictive judgments” of legislative bodies. Turner Broad. Sys. Inc. v. FCC, 520 U.S. 180, 195, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997). “In the context of firearm regulation, the legislature is ‘far better equipped than the judiciary’ to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks.” Kachal-sky, 701 F.3d at 97 (quoting Turner Broad. Sys. Inc. v. FCC, 512 U.S. 622, 665, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)). As the Second Circuit aptly explained, “[i]t is the legislature’s job, not ours, to weigh conflicting evidence and make policy judgments.” Id. at 99; accord Woollard, 712 *1193 F.3d at 881. Further, the test on the first step of intermediate scrutiny only requires that “the government’s stated objective to be significant, substantial, or important.” Chovan, 735 F.3d at 1139.
The second inquiry in an intermediate scrutiny analysis is whether there is “a reasonable fit between the challenged regulation and the asserted objective.” Id. First, as the majority properly notes, California does not impose a complete ban on the carrying of concealed weapons in public. CaLPenal Code § 25400. A gun owner’s residence, place of business, and private property are exempt from § 25400. Id. at § 25605. Carrying a concealable firearm within a vehicle is not a crime if the firearm is within a vehicle and is either locked in the vehicle’s trunk or in a locked container. Id. at § 25610. Peace officers, retired officers, military personnel, and retired federal officers are permitted to carry concealed weapons. Id. at §§ 25450, 25455, 25620, 25650. Hunters and anglers may carry concealable firearms while hunting or fishing. Id. at § 25640. Section 25400 does not apply to transportation of firearms to or from gun shows or similar events, id. at § 25535, nor does it apply to people practicing shooting targets at established target ranges, whether public or private, id. at 25635.[8] And, of course, California is a “may-issue” state, in which concealed public carry is allowed with a proper permit. Id. § 26150.
Because of these exceptions, the California Court of Appeal concluded that California’s concealed carry statutes were “narrowly tailored to protect the public,” and did “not substantially burden defendant’s exercise of his Second Amendment right.” People v. Ellison, 196 Cal.App.4th 1342, 1351, 128 Cal.Rptr.3d 245, 252 (Cal.App. 2011).
Second, the San Diego County “good cause” permit requirement itself does not preclude all carrying of concealed weapons in public. It limits the risk to public safety by reducing the number of guns in public circulation, but allows those who will most likely need to defend themselves in public to carry a handgun. In this way, the licensing scheme is “oriented to the Second Amendment’s protections.” Kachalsky, 701 F.3d at 98. Of course, the good cause requirement is not perfect. Not everyone who may ultimately need the protection of a handgun may obtain a permit, and there is a risk that some concealed-carry license holders may misuse their firearms. But the good cause requirement does not have to be perfect; indeed, it is unrealistic to expect any regulatory measure to perfectly solve the problem to which it is addressed, especially a problem as complex as gun violence. Rather, under intermediate scrutiny, the challenged regulation must strike a reasonable balance between the burdened right and the public need. By granting concealed-carry licenses only to those who are known to need them for self-defense, the good cause requirement strikes a reasonable balance between individuals’ interest in self-defense and the public’s interest in limiting the proliferation of handguns in public spaces.
When viewed objectively, the San Diego County “good cause” policy easily survives intermediate scrutiny. The government has identified significant, substantial, or important objectives and provided a reasonable fit between the challenged regulation and the asserted objective. Therefore, even if the Second Amendment protection were extended to provide a *1194 right to carry concealed weapons in public, the “good cause” San Diego County requirement would still pass constitutional muster.
rv
Rather than employing the straightforward methodology prescribed by Chovan, the majority wanders off in a different labyrinthian path, both in its analysis of the Second Amendment right at issue and its analysis of the government regulation in question. In doing so, it conflicts with the instruction of the Supreme Court, the holdings of our sister circuits, and our own circuit precedent. It needlessly intrudes and disrupts valid and constitutional legislative choices. I must respectfully disagree with its approach.
A
The majority never answers the question as to whether carrying concealed weapons in public is protected under the Second Amendment. Rather, it engages in a broader circular inquiry. It first exceeds the bounds of Heller by determining that the Second Amendment protects at least some conduct outside the home. It then reasons that because the Second Amendment protects some conduct outside the home, states may not completely prohibit carrying handguns outside the home. The majority then examines the California regulatory scheme and concludes that, because California bans open carry in most public areas, it must allow concealed carry without the necessity of showing good cause. Therefore, it reasons, San Diego County’s “good cause” requirement must be unconstitutional.
1
The majority’s logical tapestry quickly unravels under close examination. If carrying concealed firearms in public falls outside the Second Amendment’s scope, then nothing — not even California’s decision to restrict other, protected forms of carry — can magically endow that conduct with Second Amendment protection.
An analogy to the First Amendment context illustrates this point. See Heller, 554 U.S. at 595,128 S.Ct. 2783 (analogizing the Second Amendment to the First). There are, of course, certain types of speech that do not fall within the protection of the First Amendment, such as child pornography, obscene material without serious literary, artistic, political, or scientific value, “fighting words,” and speech that materially assists a foreign terrorist organization.[9] If a state decided to ban all protected First Amendment speech, would that bring child pornography, obscenity, “fighting words,” and material assistance to a foreign terrorist organization under the protection of the First Amendment? Of course not. However, that is precisely the flawed reasoning that the majority employs.
The same logic applies in the Second Amendment context. If certain conduct falls outside the scope of the Second Amendment, then restrictions on that conduct are valid, regardless of the regulatory landscape governing different activities. Chester, 628 F.3d at 680. The majority simply makes up the right out of whole cloth, or perhaps more aptly put, no cloth. Regulation of unrelated conduct cannot *1195 create a new right where none existed before.
Unsurprisingly, the majority does not— and cannot — cite any authority that supports its assertion. It claims that several nineteenth-century sources cited in Heller support its proposition. As I have discussed, those sources support no such proposition. In Chandler, the Louisiana Supreme Court explained that a concealed weapons ban “interfered with no man’s right to carry arms” under the Second Amendment, which it defined as the right to carry arms “in full open view.” 5 La. Ann. 489, 490 (1850). In Nunn, the Georgia Supreme Court held that “[a] law which merely inhibits the wearing of certain weapons in a concealed manner is valid.” 1 Ga. 243, 243 (1846) (emphasis in original); see also id. at 251. In Reid, the Alabama Supreme Court explained that a concealed-carry ban did not “come in collision with the constitution” because it sought to “promote personal security” by “inhibiting] the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others.” 1 Ala. 612, 617 (1840). And George Chase’s American Students’ Blackstone notes a consensus that “statutes prohibiting the carrying of concealed weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms in a particular manner, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence.” 1 The American Students’ Blackstone 84 n.ll (George Chase ed.1884) (emphasis in original).
Although all the nineteenth-century cases cited by the majority cautioned against restrictions on the open carrying of weapons, none of them — except the discredited, outlier Bliss — suggests that restrictions on carrying concealed weapons implicate the Second Amendment. See Chandler, 1 La.Ann. at 490; Nunn, 1 Ga. at 251; Reid, 1 Ala. at 616-17. And nothing in these cases or Chase’s Blackstone even hints that a restriction on carrying concealed weapons would become invalid if restrictions were placed on open carry. Rather, they suggest that restrictions on concealed carry are always valid, while there are limits to restrictions on open carry.
The majority concedes that it is in conflict with the Second, Third, and Fourth Circuits in Drake, Woollard, and Kachol-sky. However, it insists that it is in accord with the Seventh Circuit’s decision in Moore. But Moore did not involve a challenge to the implementation of a “good cause” requirement to carry a concealed weapon in public. Rather, it was a direct challenge to an Illinois law banning almost all forms of carrying a loaded firearm outside the home and did not involve “narrower, better tailored restrictions” such as the one at issue here. See Moore v. Madigan, 708 F.3d 901, 904 (7th Cir.2013) (Hamilton, J., dissenting from denial of rehearing en banc).
2
The majority essentially concedes that the Plaintiffs’ challenge to San Diego County’s “good cause” policy fails unless we consider California’s regulatory scheme in its entirety. According to the majority, the Plaintiffs’ challenge “is not an attack trained on a restriction against concealed carry as such, or viewed in isolation.” Rather, the Plaintiffs “target[ ] the constitutionality of the entire scheme” of carry regulation in California. Indeed, if California did not restrict open carry, Plaintiffs would have no cause for complaint. And, of course, if California law permitted *1196 unrestricted concealed public carry, there would be no case at all. It is by California statute that local Sheriffs are invested with the discretion to grant concealed carry permits. Plaintiffs’ real quarrel is with the statute. Their theory is that the statutory discretion afforded Sheriffs should be uniformly excised. Thus, by arguing that the Second Amendment compels the County to interpret “good cause” to include a general desire to carry a concealed gun, the Plaintiffs in reality are challenging the constitutionality of the § 26150 good cause provision. Their proposed remedy of preventing California Counties from exercising discretion eliminates the statutory “good cause” requirement and transforms it into a “no cause” limitation for the general public. Thus, Plaintiffs’ complaint and theory necessarily specifically calls into question the constitutionality of state concealed carry law. Further, by arguing that California is required to provide some outlet for public carry of handguns, it indirectly implicates the constitutionality of the entire California firearm regulation scheme.
Although the constitutionality of the entire scheme is at issue, the Plaintiffs did not name the State of California as a defendant, and the Plaintiffs have not complied with Fed.R.Civ.P. 5.1. Under that rule, if the state or one of its agents is not a party to a federal court proceeding, “[a] party that files a pleading ... drawing into question the constitutionality of a ... state statute must promptly” serve the state’s attorney general with notice of the pleading and the constitutional question it raises. Fed.R.Civ.P. 5.1(a). In addition, the district court must certify to the state’s attorney general that the constitutionality of the state statute has been questioned, and must permit the state to intervene to defend it. Fed.R.Civ.P. 5.1(b), (c); 28 U.S.C. § 2403. The rule protects the public interest by giving the state an opportunity to voice its views on the constitutionality of its own statutes. Oklahoma ex rel. Edmondson v. Pope, 516 F.3d 1214, 1216 (10th Cir.2008).
Given the real essence of the Plaintiffs’ argument, they were required to comply with Fed.R.Civ.P. 5.1. They did not. If we are to consider the constitutionality of the entire California regulatory scheme, California should have been afforded an opportunity to defend it. And, to the extent that the majority strikes down the entirety of California firearm regulations, it should have stayed the mandate to permit a legislative response, as the Seventh Circuit did in Moore. 708 F.3d at 942.
B
I must also respectfully disagree with the majority’s analysis of the government regulation at issue, which directly conflicts with our circuit precedent in Chovan.
1
The majority acknowledges that we, like our sister circuits, employ a sliding-scale approach, where the level of scrutiny we apply to a challenged law depends on how severe a burden the law imposes on the “core” of the Second Amendment guarantee. Chovan, 735 F.3d at 1138; see, e.g., Kachalsky, 701 F.3d at 93; Heller, 670 F.3d at 1257; Ezell, 651 F.3d at 708; Chester, 628 F.3d at 682; United States v. Reese, 627 F.3d 792, 801 (10th Cir.2010); United States v. Marzzarella, 614 F.3d 85, 96-97 (3d Cir.2010). But then the majority purports to take an “alternative approach,” which it claims was used in Heller. Under that alternative approach, the majority rejects any means-ends scrutiny. In doing so, it directly conflicts with Cho-van.
Despite whatever pedigree the majority claims for this alternative approach, we *1197 are bound to follow the law of our Circuit. Further, the majority approach has no support in Heller. The Heller Court held only that the D.C. handgun ban was unconstitutional “[ujnder any of the standards of scrutiny that we have applied to enumerated constitutional rights” because “[fjew laws in the history of our Nation have come close” to the severity of its restriction. Heller, 554 U.S. at 628, 629, 128 S.Ct. 2783. The Court did not expressly reject means-ends scrutiny, and it is extremely unlikely that the Court rejected by implication such a well-established method for assessing the constitutionality of laws. Indeed, by taking care to specifically rule out rational-basis scrutiny, the Court necessarily implied that other, heightened levels of means-ends scrutiny are appropriate. See Heller, 554 U.S. at 628 n. 27, 128 S.Ct. 2783.
The majority suggests that the Heller Court rejected any means-ends scrutiny when it rejected Justice Breyer’s “interest-balancing inquiry.” See 554 U.S. at 634-35, 128 S.Ct. 2783; id. at 689-90, 128 S.Ct. 2783 (Breyer, J., dissenting). However, the Court did no such thing. Justice Breyer’s dissent advocated against applying established tiers of scrutiny, preferring instead to decide case-by-case whether a challenged law burdened the Second Amendment at all. Id. at 689, 128 S.Ct. 2783 (Breyer, J., dissenting). The Heller Court dismissed this case-by-base inquiry, noting that “[wje know of no other enumerated constitutional right whose core protection has been subjected to a freestanding ‘interest-balancing’ approach.” Id. at 634, 128 S.Ct. 2783 (emphasis added). By this, the Heller Court did not disavow the means-ends scrutiny framework for evaluating burdens on enumerated rights, which has long been a fixture of constitutional rights jurisprudence. See generally Adam Winkler, Scrutinizing the Second Amendment, 105 Mich. L.Rev. 683 (2007); see also Kachalsky, 701 F.3d at 99 n. 23 (rejecting the argument that “handgun possession in public has the ring of an absolute constitutional right”). Rather, the Court meant only that severe burdens on “core protections” would fail any level of scrutiny and- cannot be excused through the sort of freewheeling interest-balancing approach Justice Breyer proposed. Heller, 554 U.S. at 628, 128 S.Ct. 2783 (“Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one’s home and family would fail constitutional muster.”) (internal quotation marks, footnote, and citation omitted).
The majority’s new alternative approach to establishing the appropriate level of scrutiny is unsupported in Supreme Court precedent and is in direct conflict with our Circuit’s precedent and the approach taken by our sister circuits.
2
The majority also errs in its alternative intermediate scrutiny analysis. The majority acknowledges the Chovan second step inquiry as to whether the government policy is a reasonable fit between the challenged regulation and the asserted objective. But, rather than applying that analysis, it substitutes the demanding and inappropriate least restrictive means test.
There is no support for the application of a least restrictive means test in Chovan, and our sister circuits have repeatedly and emphatically recognized that, in this context, intermediate scrutiny does not require the least restrictive means available. See Masciandaro, 638 F.3d at 474 (“[I]n-termediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question.”); Heller, 670 F.3d at 1258 (explaining that *1198 under intermediate scrutiny, there must be a tight fit “ ‘that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective’ ”) (quoting Bd. of Trustees of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)). In other words, the fit between the good cause requirement and public safety objectives must be “reasonable, not perfect.” Marzzarella, 614 F.3d at 98.
The majority also rejects Turner Broadcasting’s, admonition to afford “substantial deference to the predictive judgments” of legislative bodies, Turner Broad. Sys. Inc. v. FCC, 520 U.S. 180, 195, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997), and criticizes our sister circuits’ reliance on Turner Broadcasting.
However, “[i]n the context of firearm regulation, the legislature is ‘far better equipped than the judiciary’ to make sensitive public policy judgments.” Kachalsky, 701 F.3d at 97; see also Drake, 724 F.3d at 436-37; Woollard, 712 F.3d at 881. This advice is particularly apt when we consider the widely-varying state and local gun laws that are tailored to particular community needs. What law enforcement deems a critical restriction in urban areas may not be as important in rural portions of the country. Those, sensitive policy assessments are best made by the respective legislative branches and, when permitted by statute, by local law enforcement officials.[10]
Turner Broadcasting itself provides a sound rejoinder to the majority: “Even in the realm of First Amendment questions where Congress must base its conclusions upon substantial evidence, deference must be accorded to its findings as to the harm to be avoided and to the remedial measures adopted for that end, lest we infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy.” Turner, 520 U.S. at 196, 117 S.Ct. 1174 (emphasis added).
Finally, the majority derides the good cause requirement as nothing more than an arbitrary, overbroad rationing system. In fact, the record supports the opposite conclusion. The County does not randomly allocate concealed-carry licenses to people regardless of need. Instead, it makes the best prediction possible of who actually needs firearms for self-defense, and grants concealed-carry licenses accordingly.[11]
IV
A careful examination of the narrow questions before us can only lead to the *1199 conclusion that San Diego County’s “good cause” policy falls squarely within the Supreme Court’s definition of “presumptively lawful regulatory measures.” Heller, 554 U.S. at 626, 627 n. 26, 636, 128 S.Ct. 2783. There is no need to reach any other issue presented in the case. In dealing a needless, sweeping judicial blow to the public safety discretion invested in local law enforcement officers and to California’s carefully constructed firearm regulatory scheme, the majority opinion conflicts with Supreme Court authority, the decisions of our sister circuits, and our own circuit precedent.
I respectfully dissent.

. Compare Moore v. Madigan, 702 F.3d 933, 935-36 (7th Cir.2012) with Moore, 702 F.3d at 944-49 (Williams, J., dissenting).

. In post-Heller jurisprudence, nearly every other circuit that has addressed this question has similarly identified the Second Amendment's core guarantee as the right of responsible, law-abiding adults to possess usable firearms in their homes. See Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 93 (2d Cir.2012), cert. denied, - U.S. -, 133 S.Ct. 1806, 185 L.Ed.2d 812 (2013) (“Heller explains that the ‘core’ protection of the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of hearth and home.”) (some internal quotation marks and citation omitted); Nat'l Rifle Ass’n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 195 (5th Cir.2012) (describing "a right at the core of the Second Amendment” as "the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family”); United States v. Greeno, 679 F.3d 510, 517 (6th Cir.2012) ("The core right recognized in Heller is the right of law-abiding, responsible citizens to use arms in defense of hearth and home.”) (internal quotation marks and citation omitted); Heller II, 670 F.3d at 1255 (explaining that the "core lawful purpose protected by the Second Amendment” is that of "a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home”) (internal quotation marks and citation omitted); United States v. Barton, 633 F.3d 168, 170 (3d Cir.2011) ("At the core of the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of hearth and home.”) (internal quotation marks and citation omitted); United States v. Chester, 628 F.3d 673, 676 (4th Cir.2010) (explaining that Heller "clearly staked out the core of the Second Amendment” as "the right of law-abiding, responsible citizens to use arms in defense of hearth and home”) (internal quotation marks and citation omitted); see also Peterson v. Martinez, 707 F.3d 1197, 1218 (10th Cir.2013) (Lucero, L, concurring separately); GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1259 (11th Cir.2012) (noting that the Heller Court "went to great lengths to emphasize the special place that the home— an individual’s private property — occupies in our society.”).

. See Act of Mar. 25, 1813, 1813 La. Acts at 172; Act of Jan. 14, 1820, ch. 23, 1820 Ind. Acts at 39; Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Pub. Acts. 15 ("[E]ach and every person so degrading himself, by carrying a dirk, sword cane, French knife, Spanish stiletto, belt or pocket pistols ... shall pay a fine.”); Act of Feb. 2 1838, 1838 Va. Acts. ch. 101, at 76 (making it unlawful for a person to "habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind ... hidden or concealed from common observation”); Act of Feb. 1, 1839, ch. 77, 1839 Ala. Acts at 67-68; Act. of Mar. 18, 1859, 1859 Ohio Laws 56 (providing that "whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty.”).

. "See Act of Feb. 1, 1839, ch. 77, 1839 Ala. Acts at 67-68; Act of Apr. 1, 1881, ch. 96, *1185 § 1, 1881 Ark. Acts at 191; Act of Feb. 1, 1881, 1881 Colo. Sess. Laws at 74; Act of Feb. 12, 1885, ch. 3620, 1885 Fla. Laws at 61; Act of Apr. 16, 1881, 1881 111. Laws at 73-74; Act of Jan. 14, 1820, ch. 23, 1820 Ind. Acts at 39; 29 Ky. Gen.Stat. art. 29, § 1 (as amended through 1880); Act of Mar. 25, 1813, 1813 La. Acts at 172; 1866 Md. Laws, ch. 375, § 1; Neb. Gen.Stat., ch. 58, ch. 5, § 25 (1873); Act of Mar. 5, 1879, ch. 127, 1879 N.C. Sess. Laws at 231; N.D. Pen.Code § 457 (1895); Act of Mar. 18, 1859, 1859 Ohio Laws at 56; Act of Feb. 18, 1885, 1885 Or. Laws at 33; Act of Dec. 24, 1880, no. 362, 1881 S.C. Acts at 447; S.D. Terr. Pen.Code § 457 (1883); Act of Apr. 12, 1871, ch. 34, 1871 Tex. Gen. Laws at 25-27; Act of Oct. 20, 1870, ch. 349, 1870 Va. Acts at 510; Wash.Code § 929 (1881); W. Va.Code, ch. 148, § 7 (1891).” Kachalsky, 701 F.3d at 95 n. 21.

. As the majority observes, the Supreme Court rejected Aymette's conclusion that the Second Amendment enshrined only a militia-centered right. Heller, 554 U.S. at 613, 128 S.Ct. 2783. However, the Court did not question Aymette's reasoning with respect to the validity of the state's prohibition on the carrying of concealed weapons. Id.

. The majority also claims that a later Georgia case, Stockdale v. State, 32 Ga. 225 (1861), explained that "to ban both the open and concealed carriage of pistols" ‘would be to prohibit the bearing of those arms’ altogether.” This stretches Stockdale far beyond what it actually said. In that case, the defendant had been charged with violating a statute that forbade the carrying of concealed weapons. Id. at 226. The defendant requested the judge to instruct the jury that he was not guilty so long as he wore his pistol in such a way that other people could see that it was a pistol. Id. The judge refused, and instead instructed the jury that the defendant was guilty so long as any portion of his pistol was hidden from view. Id. at 226-27. The Georgia Supreme Court reversed the defendant's conviction, holding that the trial judge's instructions were erroneous. Id. at 227-28. The court reasoned that it is impossible to carry a pistol without concealing at least some portion of it, so requiring that every inch of the pistol be exposed to view would make it practically impossible to carry it, thereby violating Nunn’s admonition that any regulation that practically prohibits a person from bearing arms openly is unconstitutional. Id. at 227. Stockdale was a simple application of Nunn’s clear holding, and the majority is wrong to attribute a different meaning to it.

. We are not alone in this application. Other circuits that have considered a restriction similar to the good cause requirement have applied intermediate scrutiny. See Woollard *1192 v. Gallagher, 712 F.3d 865, 869, 876 (4th Cir.2013) (applying intermediate scrutiny to a Maryland statute requiring applicants to demonstrate a "good and substantial reason to wear, carry, or transport a handgun” in order to obtain a license to do so); Kachalsky, 701 F.3d at 96 (applying intermediate scrutiny to a New York statute requiring applicants to demonstrate "proper cause” in order to obtain a license to carry concealed handguns).

. Carrying a concealable firearm is permitted in a number of other circumstances. See generally id. at §§ 25450-25650.

. See New York v. Ferber, 458 U.S. 747, 764, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (child pornography); Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (obscenity); Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (fighting words); Holder v. Humanitarian Law Project, 561 U.S. 1, 130 S.Ct. 2705, 2722-23, 177 L.Ed.2d 355 (2010) (material assistance to terrorists).

. Indeed, the California State Sheriffs Association, the California Police Chiefs Association, and the California Peace Officers Association note in their amicus brief that the diversity of communities and regions in California warrants the exercise of discretion by chief law enforcement executives to determine, in the context of the issues presented in their jurisdiction, the circumstances under which a concealed gun permit should issue.

. I would also reject the Plaintiffs’ alternative equal protection claims. Their first claim is merely an attempt to bootstrap an equal protection argument to their Second Amendment claim, so it is more appropriately analyzed under the Second Amendment. Cf. Al-bright v. Oliver, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); Orin v. Barclay, 272 F.3d 1207, 1213 n. 3 (9th Cir.2001) (holding that an equal protection claim was "no more than a First Amendment claim dressed in equal protection clothing” and was therefore "subsumed by, and co-extensive with” the former). As for their "class of one” equal protection claim, the Plaintiffs did not establish a genuine issue of material fact with regard to whether they were situated similarly to the renewal applicants belonging to the Honorary Deputy Sheriff’s Association ("HDSA”). See Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam) (recogniz *1199 ing a "class of one” equal protection claim “where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.”). The HDSA renewal applicants documented specific threats or otherwise qualified for renewals, so they were not similarly situated. I would also reject Plaintiffs’ remaining due process and privileges & immunities. claims because Plaintiffs failed to "specifically and distinctly argue [them] in [their]'opening brief.” Greenwood v. F.A.A., 28 F.3d 971, 978 (9th Cir.1994).